May I please the court? I'm Karen Landau. I represent Alex Markevich, but I'm arguing for the first group. All of these defendants were straw buyers. They were charged with and convicted of wire fraud based on a number of false statements made in loan packages. The defendants were deprived of the right to present a defense because they didn't get to put in any evidence on the question of Well, it was let me let me address the issue of procedure here. So this case is closely associated with the other related cases on this calendar. They were all part of the same conspiracy, with the Markevich defendants being the least of the of the group. And they in in January, the Court ruled in the Kuzmenko case that it would exclude the evidence of the expert who was offered to testify about lending practices in the industry. This case was tried, and in fact, the opening brief in my case was filed pre-Lindsay, but the evidence was offered both as to specific lending practices and as to the practices of the lender. In looking at the tender that your the trial attorney, your client made, you didn't talk about anything about industry standards in terms of the expert testimony. Well, they didn't talk about things in detail at all, partly because the evidence was excluded wholesale in the earlier order on January 12th. All of the defendants in this case, except my client who represented himself, the others were all represented by CJA attorneys. They well knew what Judge Mendez's ruling was. And it would not have been a very good use of CJA funds to develop an extended expert proffer when they knew it wasn't going to come in. I think the point is — Except to preserve it. I mean, that's the difficulty, is if you take the line that was drawn in Lindsay between mortgage practices nationally or the national standards and the individual practices of the lender, it's hard to see in the proffer where there was any distinction between the two or a reference to industry standards. So, I mean, in reviewing his decision for abuse of discretion, it's hard to see how even pre-Lindsay that that was an error. Well, actually, well, Your Honor, for one thing, I do not think it's reviewable for abuse of discretion. I think it's a — it's the — they were denied the right to present a defense. I understand your theory, but if it's — if we're just talking about admission of — But in terms of the admission of evidence, I respectfully disagree. First of all, the judge's own conduct made it — I mean, the judge pretty much closed the door. The judge saw all of this evidence as what he termed and what the government termed lender negligence, which we now know it's not. It's not only lender negligence, or rather, it may be fair to say that the same evidence that tends to show lender negligence also goes to materiality, and it's admissible for that purpose. And the — the judge was — I mean, everybody in — and I can say this fairly because I've handled a few cases from this district. The judges in the district were aware of the black testimony that was going around. Defense counsel were using it, were proffering it. One judge, the late Judge Carlton, had allowed the testimony. The other judges in the district declined to do so. And the — the black testimony is, if one reads the report that was offered and his trial testimony in Cherikov, some of it might have been excludable under Lindsay, but a lot of it was not because a lot of it went to industry practices at the time. More the point, in this case, the judge specifically adopted his order in Kuzmenko in this case, and he said the issue was preserved. So how would counsel know what to do at that point? I mean, basically, I mean, in all due respect to the judge, yeah. Kneedler, I have to go back to — I mean, I practiced in courts where you knew that the — you were facing an uphill battle, but that's where you got to make the record. I mean, that's what's — you got to preserve the record for appeal or else you end up — and that's not your fault because you weren't trial counsel, but I mean, that's where her face was. And I guess before I leave it, there's this line of cases that we have that says if there's a denial of the motion in limine, that's only a preliminary decision until it's — the evidence isn't offered at trial, and the evidence can be offered at trial in an expanded fashion. And if you don't offer it in an expanded fashion, then you waived it to the extent that the ruling hasn't been made, and all the ruling here was no evidence of lender negligence. Right. The problem with that line of cases applied here is that I don't think Judge Mendez could have been clearer. He said this isn't coming in, I know what this is, and he considered all of it as lender negligence. That is — I think, you know, ultimately when we look at whether an issue is preserved, we look at was it fairly preserved, did the district court have an opportunity to address it. Well, he did. He did. That's what the Kornhusker case says. And I think under that standard, I mean, again, I have to go back to the fact that is the judge going to approve CJA funds for this? Once he'd said — Well, you have to ask. Well, you have to ask, but they have to ask. No, there's no harm in asking, right? Right. Right. But the thing is — You ask and it's denied, and you've got — you're really preserving it. The thing is, is what you have is here — here he — you have — you have a record where they do know. They know because — Well — They know what the black testimony is. They submitted the — you know, they — they — he said — They know what the black testimony is because they just refer to what was said in the Judge Garland trial. In the Cherokoff case, yes. And they — Was that brought in as a transcript, or what was it? I can't recall if it was introduced as a transcript in this case, in all honesty. They — Just refer to? Yes. They did. For example, one of the trial attorneys said, Mr. Warren — this is the — this is at ER 63. He — the judge asked about the expert that attorney Warner was going — was offering. And Tim Warner said, his testimony, what I told the government, is that his testimony would be in line with Mr. Black's testimony that he gave. I believe it's in the Cherokoff case, and the government has the case number for that. I put them on notice that that would, in essence, be the content of his testimony. But how are we supposed to review that? Well — I mean, that's — that's my problem, and I'm not quarreling with you. I'm just expressing my concerns. It's that I think in the perfect world, as far as I'm concerned, you have the motion eliminated. It's denied on the basis of lender negligence. And you go to trial, and you say, Judge, we want to proffer additional expert testimony. We want to proffer additional expert testimony on lending practices. But I don't see how the national lending practices issue was ever preserved in a way that the judge was ruling on. Because as you said, he said, this is all lender negligence. Right. Except that, again, I go back to the Black testimony, and it's clear because it — if you — if you read the testimony, and of course I have — Right. But we don't have it from the other case. It's not in the record here. I — it's not in the excerpts. I don't recall seeing it. You can point us to it. Can I ask — can I just change the question a little? Yeah, sure. This may be my lack of understanding of the underlying law here. But what — what is it that needs to be material? That is, we — there was an example in Lindsay of — that something might not be material if you asked a question about marriage, but nobody ever looked at the answer. But here, in fact, the answer — it did matter, and I don't understand anybody quarreling with this, that these people put down on the piece of paper information from which they were — would appear to be qualified. Right. And that that information was looked at. In other words, if they had put down their actual income, presumably they wouldn't have gotten the loans. So the question is, does — if the answer was material, the lie may not have been material because nobody cared whether it was true or false, maybe, is what you're trying to demonstrate. But is that the standard? If it was a lie and they cared about it, that having the lie, then why isn't that worrying about whether the people looking at it cared whether it was true or not? Well, I think that's — that's what the government would say. So I think there's — But I'm asking a conceptual question about what the statute means. I think there's — I think there's a twofold answer. So, first, I think that — and that is why I think Escobar — well, or Lindsay, because Escobar really talks about the victim. So the fraud statute is written so that the — the misrepresentation in question has to be material to the victim. So who's the victim, right? Well, it was material in the sense that the answer to the question mattered. The question is whether it has to matter whether it's true or not. And does that — is that what the statute means, they have to care whether it's true or not, as opposed to they have to care what the answer is? I think it does. I think it does. Otherwise, it would be — it would be — otherwise, then anything could be material. If materiality is an objective standard, right? Right. So then it has to — it has to matter if it's true or not. Why? I mean, here they clearly cared — I mean, you don't doubt that having the appearance of having — of being qualified did matter on the piece of paper? You know, I honestly don't know. And I think that's why it's a jerk question. I don't know what these lenders cared about or if they cared about anything. And I think there's a lot of evidence that Donald Duck could have filled out an application and he might have been approved. I don't — I don't know. Yeah, but the regulators would have closed him down. This is a highly regulated industry. They look at the loans. If, in fact, they were making a loan to Donald Duck with no assets — I don't know, Your Honor. I don't know. Maybe Donald Duck with royalties does have some assets. Right. But, Your Honor, I mean, I really — I mean, I think that's the point, is I don't really know. And I think it's a jerk — and we know it's a jerk question. It's not a jerk question. It's a legal question. It's what does the statute mean? Oh, what does the statute mean? What does that statute mean, the wire fraud statute that we're dealing with? If there is a misrepresentation, it's not true. I think — And it — and the statement is material, meaning that without that statement, they made it because they knew without the statement they wouldn't have gotten the loans, and they wouldn't have, then what else matters? I think it has to be true. I think the truth of it has to be material to the lender, because otherwise the statute is so — I mean, now, I mean, it's just — this is not a question I anticipated, but it's interesting. Well, it's material to the world, right? In the larger sense, it's material. In the sense, the truth of it. In the sense, what happened, because it wasn't true. So it's material to — True. But it's not — Their ability to pay, it is material to the securitization process. It's material to a lot of things. It just may not have been material to the lender. And it may not have been material to the entire industry, which I think is the point. Well — But I think to answer — to try to answer your question, I think it does have to be true, because the fraud statute requires a misrepresentation. That means that the truth has to matter. Otherwise, why do we even — if you don't have to have a material misstatement or omission, then, I mean, the truth has to matter. The presumption is that you have to — it has to be truthful, I think. But doesn't Lindsay's basically say that it has to matter on an objective, industry-wide basis, as opposed to the particular lender? Yes, it does. So it has to matter on an industry-wide basis, because there are regulations. This is the core of bank regulation. But that's where I think that's not necessarily true. I think that what we have — But if everybody's committing fraud, then that excludes interclient fraud. But we have — what if we have the whole industry, or a significant — or half of the industry, or the bulk of the industry, they don't really care because they're focused on something else? I think in that situation, the jury should be allowed to decide materiality. That's — I mean, that's what the law requires. That's what — what Gowden and Netter require. And that's — I mean, yes, I — I mean, I agree. It's a problem, because what we have is — what do you do when the whole industry goes south? Who's responsible? But that is not the lowest defendants' problem, ultimately. You know, the fact that it may have been material to the — the investors who ultimately bought the — Does the statute require that the victim be defined in the — in the indictment, or elsewhere? No. No. No, but in fact, the victim is defined, always. And in this case, the victim was defined as First Franklin. So, Ms. Lendow, if the defense had an opportunity to call their expert, what would he have testified to? He would have testified about the industry. And — And that's it? Well, he would have — he would have been allowed to testify about the lending practices in the industry. Okay. And that would probably have included a discussion of what's called control fraud and — And we know — A discussion of securitization and — and the practices of the industry in the relevant time period. And we know that because of what he testified to in this trial? Yes. That's the only way we would know it, because from the interchange at the Inlemany motion, it's completely vague. Right. We also know it, as I recall, from the actual order in Kuzmenko. He was not going to testify to anything about the particular lending practices of the banks in Russia? Well, I'm sure at the time, they would have offered that testimony as well. And that would have — because at the time, this case was tried before Lindsay. Well, no. I mean — Yeah. And I'm sure he would have — Well, now we know — we have Lindsay, so — We have Lindsay. So, no, now I think he would not be allowed to do that, unless, of course, the government opened the door to broader testimony. Well, what about that? What about the fact that the government offered this Ms. Hansen person, who did go into a lot of the details of what — Yes. — First Franklin itself did? Well, right.  I think the government opened the door to evidence about the lenders' practices because the government presented — or, rather, I should say, Hansen presented First Franklin as though it was a legitimate corner store lender that had — you know, that cared about false statements and, you know, this would be significant, that would be significant, the next thing would be significant. They — when asked why, she said that if certain statements were not true, First Franklin essentially testified that all of these statements were material. And, yes, I think the government did open the door to — and I think, you know, in the future, the government will need — So does Lindsay mean that the government should only call industry practices somebody who's an expert in industry practices? I think that's up to the government. I think the government can decide how it's going to try its case. But if the government — if the government presents testimony that the lender considered certain — certain statements to be significant or material or that the lender wouldn't have funded a loan without that test — without that information being truthful, then I think they are opening the door, and that's up to the government to decide how they want to try these cases in the future. Do you want to reserve?  Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Christopher Hales for the United States. I was one of the trial counsel for the government in this case. I think this case exemplifies why Rule 16's disclosure requirements for expert testimony make a lot of sense, not just for fairness to the parties, but for the district court so it knows what it's being asked to rule upon, and for Your Honors, so that when you're being called upon here to review whether there was any abusive discretion or plain error, it's clear in the record what was being proffered. And I want to go back and talk about the history — Well, I agree with you, but the district court didn't exclude the testimony based on Rule 16, correct? That's correct. So do you have a case that says that we can apply a discovery rule on appeal with Rule 16? Well, I think this court can affirm based on any ground that's readily apparent in the record. And I think the record, you know, as described in the government's brief shows — That wasn't my question. I don't know, because we've been through this in another case, and I don't think there's a case that says that we on our own can apply Rule 16 on appeal. I'm not sure. I don't know, Your Honor. In other words, it's a discretionary rule essentially, and if it wasn't applied, then how do we apply it? Well, I'm sorry. It was a discretionary rule essentially. The judge could have excluded it for that reason, but he didn't have to exclude it for that reason, so how can we exclude it for that reason? I see what you're saying, Your Honor. It was discretionary for the court. I think, I mean, even moving beyond that, the point here is if we're looking at the judge's ultimate ruling, what was presented to Judge Mendez and what was before him, and, you know, Judge Thomas, as you were talking about, it's the — what is now being argued in the reply brief about general practices in the industry. That is not what was proffered here. Well, it wasn't not proffered. It just wasn't — nothing was specifically proffered. Right? What are you calling the proffer exactly? It was just a reference to the black testimony in the other trial, right? That was the sum total of it, and — So suppose I haven't read the black testimony. I don't know if it's in the record, in the excerpts of record. I assume you've read it. I've read the Daubert hearing transcript that's in the defendant's excerpts of record here. And I want to stress, that was not placed before Judge Mendez in the district court. And in excerpts of record 419 and 420, when he's in the Kuzmenko case and he's talking about what happened in Cherokov several months earlier, he stresses, I don't have the transcripts talking about the Cherokov case. But that's all procedural. I guess what I'd like to ask you is, given what the testimony actually was, would some of it have been admissible under Lindsay, as illustrated in the Daubert hearing in the other case? No, I don't think so, Your Honor, because the way that it was framed in that testimony where Black in the Cherokov case was talking about, he was talking about Greenpoint and Aegis when they got down to, and as the defendants say here, he was talking about, this is from opening brief 23, and it's consistent with Black's transcript. He was talking about certain lenders, distinguished with what is described at 1017 in the Lindsay opinion as the entire mortgage industry, which is the relevant sort of backdrop to do this objective standard determination for materiality. So even though the district court did not have the Black transcript and was not in the Kuzmenko case that occurred in January 2015, even though the district court was not talking about Black, but rather a different expert named Partnoy, even if it had that transcript, it did not set out the type of general industry testimony that the defendants are saying now that it did. One way to see that is the difference. Well, because you're saying that the industry means not just the bad guys, but everybody. Yes. And that's very clear at 1017. But that's assuming there were some good guys, right, at the time. Yes, Your Honor. Which we don't even know. Okay. But that is from the Lindsay opinion. I mean, that's what it says. It says the entire mortgage industry, so not a subset. And what Black was talking about was a subset talking about stated income loans and no document loans, which is, you know, in fact, not what we had in this case. We had bank records that had been falsified. There were false rental agreements to show income for the people buying the properties, various other statement pieces of information in the loan files there that don't appear to be what Black was talking about in the other case. So even though Judge Mendez didn't have this transcript and he said so in Kuzmenko and it was never presented in this case, even if he did have it, it doesn't talk about the general, you know, the entire industry type of issues that the defendants are now saying that they would have presented with Black. And the opening brief talks, they're approximately 13 times between pages 20 and 42, in the opening brief in this appeal, where it's very clear that the defendants are talking about targeting this testimony in defense at First Franklin and showing that First Franklin didn't rely on these and there's no discussion of general industry practice. It's only in the reply brief at page 8 where, for the first time, they say this was really about, you know, the general industry practice. And that's after, of course, the Lindsay opinion had come out. But there's nothing that they can point to in the record to say that that was the type of testimony they were proffering. You know, it made sense that they would argue that now after the Lindsay opinion has come out. But that's not what they were proffering to Judge Mendez. And — Kagan. But if I didn't think — I understand that he didn't have the transcript. That's its own problem. But if he'd had the transcript and I didn't think — certainly a fair amount of what was in that transcript did not go to particular lenders and particular abusers. It went to the — at least a large subset of the industry. And your argument is a large subset isn't good enough. But if I didn't agree with that, then what is in the black testimony, some of it would have been admissible under Lindsay if properly presented. No? I'm not sure I agree with that, Your Honor, because he — first of all, he is talking about, in my view, their — and as the defendant said in the brief, certain lenders, not the entire industry. I know, but he already said that. But I back that out for now. Okay. Moving beyond that, what is not stated in that transcript, in my view, is that the types of false statements that we're talking about in this case, about income and things like that, that those were not material in the industry generally at the time. In fact, if you look at what Black says in that Daubert hearing transcript, it's the opposite. He's shown a loan application where it listed $16,000 a month in income, and he's asked by the government counsel on cross what would have happened if he had listed $4,000 in income on this loan application instead. And what Black says, and this is a direct quote from the transcript, is that would tend to prevent funding of the loan. So he's agreeing that — But that really goes to my other point, which I'll ask you about, too. I mean, there's no doubt that the statements were material in the sense that without the statements, they wouldn't have gotten the loans. So, I mean, so that's all he was saying. If it didn't say 4,000 — if it said — if it didn't say $12,000, they wouldn't have gotten the loan. But the question is, how does that match up with the statute in terms of materiality? If it was a false — does it matter if it was false or — does it matter whether the lender cared whether it was false as opposed to cared whether it was there? And I think we can look to Lindsay and, you know, Blixt and a lot of the other cases where it talks about what materiality means in the mail and wire fraud statutes to answer that question. The answer is, based on Lindsay, no, if the particular lender in this case didn't care or even intentionally disregarded that information, that doesn't defeat materiality because it is an objective standard that we're talking about, and we're talking about the intrinsic capabilities of the standard. That's not really answering my question. Well, I'm being too — I mean, what I'm asking is, if — let's suppose the whole industry operated this way, i.e., as long as you had it on the piece of paper, it was okay. They would rely on what was on the piece of paper. But it actually was false, and it did have ramifications, although not necessarily the ramification that anybody was going to not give you the loan. Does that matter? In other words, how does the statute — what does the statute care about? Well, if it's the entire industry, Your Honor, that's doing that, then that may end up being relevant to materiality. At least that's how I read Lindsay. But that's not what Black was saying in his transcript. He was talking about a subset. And the statement that having one-quarter of the — you know, if the person had inflated their income by four times, then they put the true amount, that that would tend to prevent funding of the loan. You know, I would suggest, even though we didn't get to litigate this down below, that that's an indication that in the industry writ large, the borrower's income is something that's material still. Well, let me ask you the same question a slightly different way. And I did find the testimony in the excerpt, so — or the Daubert hearing. If I understand the testimony is, if I get to the nub of it, is that underwriters in the banking industry had these standards that had to be met. But a large segment of the banking industry was participating in fraud so that the standards would appear to have been met. So I guess the question on materiality is, does it matter whether it should be the standard or whether it's the practice of ignoring the false statements? Which is it? I need to think for a moment about that question, Your Honor. I mean, he goes on to say it's like Potemkin, that you're building false villages, you know, in his Daubert hearing. So if I understand — he said no honest — if you had an honest lender, they wouldn't lend the money they would require this. But we had dishonest lenders throughout a large portion of the industry, and they would never survive underwriting standards if they're applying honestly. So with that scenario, what's — how do we look at materiality? I mean, I think part of my conceptual confusion in addressing the question is that it's asking about the materiality with respect to particular participants in the industry when the question is really one — Well, his language, though, Black's language in the testimony was the industry. He wasn't — he didn't say he was talking about a subset. He said the industry. Didn't he? When he's talking in the early stages of his testimony about his qualifications and what he studied, he is — but then there are also points where it's clear what he's describing about the bad activity in the industry that he's claiming and describing, that he's talking about what he calls subprime lenders and certain bad actors. So I — Including the Bank of America and some other large and otherwise reputable entities. Yeah. I mean, he's not talking about every single lender in the industry. And the defendants admit that in their brief that he's talking about certain lenders, and most specifically in that testimony, Greenpoint and Aegis. Can I ask — to change the subject for a minute. Given — wasn't the government's Hansen testimony inconsistent with Lindsey? No. Why? Just as happened in Lindsey, we called someone from the lender, and Ms. Hansen, she did not testify in terms of, you know, if we knew that this person's income was $3,000 instead of over $200,000. Of course she did. I mean, at some point she said exactly that. And — and, I mean, it was very carefully worded, but I don't think we — I mean, you kept asking her whether this was significant. Well, what does that mean, other than would you rely on it? I mean, it's just careful language that — that — but it was essentially a bunch of questions about what — what is it that you care about in making loans and what you take into account and what's significant. And she said, yes, this is significant, meaning we do care about the truth of it. So why couldn't they respond to that? Well, I mean, in part — so the questions were carefully worded, Your Honor, to avoid getting into reliance. But it doesn't get into reliance. It's a phony. If something's significant, what does it mean? It means I care about it. I mean, as opposed to something, as is discussed in Lindsay, for example, marital status, you know, does that matter or not in the context of an overall relationship? Well, then she would have — if you'd asked her that, she would have said, no, it isn't significant, because it would have meant the same thing to her, i.e., I don't — I don't take it into account. So if it's significant, you take it into account. If it's not significant, you don't take it into account, i.e., you rely on it. It just doesn't make any sense to me. It's a phony. I disagree, Your Honor, in the sense that we were not — in those questions, the government was not eliciting testimony from Ms. Hansen that we could then turn around and argue in closing, you see, these loans never would have issued if the $3,000 had been put there instead of the $200,000. The purpose was to show these categories are — are significant. They have the capacity to influence, not whether or not they actually did in this instance. But she was testifying about what — she wasn't testifying about what was the matter in these particular loans, but she was testifying as to the particular lender's practices and what — whether it would pay — fund a loan or not fund a loan, depending on the truthfulness of particular statements, no? Well, the one passage where she made that comment, she was talking about a borrower certification document where the government was asking — you can see an example at SER 850-51. And so you have to look at that document to understand that one particular answer that I think we're circling around right now. I'm not just talking about that one answer, although that's the clearest one. But the whole rest of it, I mean, when — let me see if I can find an example. Well, did First Franklin rely on these types of documents the ordinary course of their business? Yes, it did. Let's see. It's hard to do it on the fly, but my understanding — all right. Could a borrower's assets be significant in First Franklin's decision to fund a loan? Yes. Why? We need to determine that the borrower has the capacity to save based on their income and money. That's not a statement that the truth of whether they have the capacity mattered to this lender? That isn't a clear implication of what she's saying? It's establishing that these statements on the loan applications are in the category of things that have the capacity or the tendency to impose. For this particular lender. For this lender. Right. And that's what Lindsay says you're not supposed to be doing. I don't know why. Personally, that whole thing doesn't make any sense to me in light of Escobar, but that seems to be what Lindsay says prophylactically. You can't with regard to individual lenders say that kind of thing, but she said it. I mean, I think it's to show generally this is the type of thing that lenders care about. Was it also important to First Franklin's decision what the applicant did for a living? Yes. That's First Franklin. Yes, Your Honor. And it's the truth of it. And it's a specific particular lender. And it's exactly what Lindsay says you can't do. I don't know that Lindsay says that the government couldn't ask those questions. Well, there are different rules for the government and the defendant. No, Your Honor. But the defendants were able to ask countervailing testimony to the extent that this ---- What were they allowed to ask? They were allowed to ask, for example, at SER 142, does First Franklin want fraudulent loans to go through? Answer, no. And there was no objection. Did they want one? I'm sorry. I didn't hear that. The question from defense counsel was, does First Franklin want fraudulent loans to go through? And the answer was no. That's at SER 142. And that starts a series from 142 to 150 in the SER where defense counsel is able to ask that and able to ask about a series of what were referred to as red flags in the loan file they were discussing, ending up with the concluding question, I mean, you're familiar with this whole file now. Isn't this, with these problems, isn't this the sort of thing that should have been rejected by First Franklin? I'm asking a different question. Why couldn't the expert then testify to that? Aside from the cross-examination. If the government can testify to what First Franklin does, why can't the government — why couldn't an expert? Because per Lindsay, the expert can talk about the general industry, because we're talking about what — I know, but that's what you didn't do here. If the government is doing it, I mean, that's the problem. This was all tried before, Lindsay, right? Yes, Your Honor. And nobody knew what this line was. So I'm not criticizing the government for doing it at that point, but now to be taking this retrospective screen at the whole, at what the defense could do, seems to skew the system. I mean, because the government did do this, which does appear to be consistent with Lindsay, and the defendants weren't allowed to do it. At the same time, there's something, you know, asymmetrical there, no? Well, I don't think it was asymmetrical because of the passage I was just referring to where they got to ask a series of counterclaiming questions. But that's cross-examination, and it was cut off at points. But still, as to the question of what was admissible at this trial, whether testimony about First Franklin's practices or a subdivision of the industry, it seems that two different rules were being applied. I see that I'm out of time, Your Honor. May I answer the question? Yes. I don't think two different sets of rules were being applied. On the one hand, the question is what could the defendants cross-examine Ms. Hansen on based on the questions that were asked. And I would submit the series of questions that Judge Mendez said they could continue asking at SER 157 and 58 allowed them to do that. On the other hand, what can be done with an expert? First of all, Lindsey says the general industry practice. And I think part of the answer is in Lindsey itself, because they're a representative from the lender testified in that case. And I think that's at 1013 in the Lindsey opinion. But they in the cross did not get to do as much in Lindsey as the defendants got to do here. They got cut off at a certain point per the opinion when questions got into about what the lender actually would have done in a certain situation, whereas here they were able to ask, does First Franklin want fraudulent loans to go through? And there was no objection. So I think that the defendants, had they proffered the appropriate expert testimony of general industry practices, then we could be having a different discussion. And as far as the cross-examination of Ms. Hansen, they were given ample latitude to conduct appropriate cross-examination. Thank you, Counsel. Thank you, Your Honors. Rebuttal. Your Honor, I'd like to turn back to the question of whether it was preserved. And I'd like to refer the Court to ER-418, which is a transcript of Judge Mendez's hearing in Kuzmenko. The Court says, In the case before the Court today, the defendants have sought to offer evidence that the lenders, and he's talking about Partnoy, who was also offered in this case, were complicit in the fraud through expert testimony from Mr. Frank Partnoy as to the circumstances surrounding the mortgage meltdown and evidence as to whether or not the lawsuits. In my opinion, that is, refers to industry. That's a shorthand for industry-wide practices. And then the Court goes on to say, he says, he says, As with the evidence considered in Litos, that's a district court case from another that the Court relied on, this information is not relevant to the objective standard of materiality developed by higher courts. Rather, this evidence would tend to show the absence of actual reliance by the lenders, which the Ninth Circuit has expressly held as irrelevant. And then the Court grants the government's motion in limine. So the Court's analysis conflated all of the evidence, whether industry-wide or specific with lender negligence. Was that statement in this case? The Court specifically adopted it. Right. But here's my difficulty, is the only thing we have as a proffer is that Markovich provides notice that he may sponsor the following witness, Jeff Tarble. His professional summary is enclosed. He would provide testimony to trial about the subject of proper mortgage procedures and protocol and the complexities of the mortgage market. And then the other, for Black, it just says he recently testified. And then on the first day of trial, the Court asks about it again. And essentially, all of that stuff that happened in the other cases is not presented in this one. What was an anticipatory ruling provoked by the government said that. So my question is, what's tendered? I'm sorry? What expert opinion was tendered absent a report in this case? Well, but I think what I'm trying to explain to the Court is this case is, notwithstanding it was charged in a separate docket number, is the same as the Cosmeco case. It's the same conspiracy. Yeah. I get that. I guess that's my point. That's the point I wanted to make. Obviously, not satisfactory. No, no. I'm not arguing with you. The other point I wanted to no, I mean, I understand. The other point I wanted to make is one of the judges, and I can't remember which, asked, I think you, Judge Thomas, asked whether the underwriters of the standard or whether the practice of the industry is the standard, and I think that shows that it's a jury question. I think that is exactly what it's for the jury to decide. The jury gets, I mean, if it were a question of law, but I think the jury gets to decide that, and that's what didn't happen here. But if I read the Black testimony correctly at the Daubert hearing, what he was saying is no honest lender would do this, the underwriters have this standard, it is material, and there's a lot of fraud in the industry. He's saying that the entire industry is fraudulent. Right. But in terms of one level as opposed to what should matter. Yeah. And I read Lindsay as saying it's what should matter. Not that you, that there is widespread fraud, because I'm not sure widespread fraud excuses individual fraud. I'm not sure it does either, but I think Lindsay says that it comes in, and I think when you're talking about, I don't think Lindsay can be just limited to this idea that, okay, we're going to admit underwriter rules, because otherwise we would have no, it wouldn't mean anything. We would just go back to the same way. I think Lindsay clearly says you get to bring in industry practices, and that makes sense when you read Escobar, the Supreme Court case, because not every statement, just because it's included, is material. So if, you know, and in Escobar, I mean, Lindsay read Escobar as the government creating its own industry, in essence, because the government is such a big contract user. But I think, I mean, and we could disagree about Lindsay, too, but I think that, you know, what you need to look at is the large, I think Lindsay allows a large section of the market. I think the government could bring in evidence that this is a legitimate standard, absolutely. But I think that the defense should be allowed to bring in evidence of what was really going on in this part of the industry. Thank you, Your Honor. Thank you, counsel. Thank you both for your arguments today. The case just argued will be submitted for decision.
judges: Thomas, Paez, Berzon